**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION**

| | | |
|---|---|---|
| PAYDAY TODAY, INCORPORATED, by its President, Robert Matijevich, | ) ) ) | |
|       Plaintiff, | ) ) | |
|       v. | ) ) | No. 2:05-cv-122 PS |
| INDIANA DEPARTMENT OF FINANCIAL INSTITUTIONS, CHARLES W. PHILLIPS, Director, individually and in his representative capacity, J. PHILIP GODDARD, individually and in his representative capacity, JOHN J. SCHROEDER, individually and in his representative capacity, MARK TARPEY, individually and in his representative capacity, and STEVE CARTER, Indiana Attorney General, | ) ) ) ) ) ) ) ) ) ) ) | |
|       Defendants. | ) ) | |

**OPINION AND ORDER**

When the Indiana legislature passed the Small Loan Act, it was attempting to curb

perceived abuses that sometime occur when a borrower pledges next week's paycheck for a loan

today. Before the Court is a constitutional challenge to the Small Loan Act brought by a payday

lender. Because the Act is rationally related to a legitimate governmental interest, the case is

dismissed.

**BACKGROUND**

Plaintiff PayDay Today, Inc. is a "payday lender" who does business in Indiana. Plaintiff

has filed suit against the Indiana Department of Financial Institutions (DFI), several DFI

employees, and the Indiana Attorney General. The DFI regulates financial institutions in the

State, including payday lenders.  Plaintiff's claims revolve around the Small Loan Act (SLA), an

Indiana statute that regulates payday lenders.   Plaintiff claims that certain provisions of the SLA

are unconstitutional.  In its Amended Complaint, Plaintiff asserts several federal claims under 42

U.S.C. § 1983 and several state law claims.  Defendants seek dismissal under Rule 12(b)(6).

### A.      Procedural History

On April 5, 2005, Plaintiff filed a complaint and a motion for preliminary injunction.

[Doc. 1, 3.]  The Court held a status conference the next week and set a briefing schedule on

Plaintiff's preliminary injunction motion.  On May 11, 2005, Plaintiff filed a Motion for a

Temporary Restraining Order (TRO) to prevent the DFI from revoking Plaintiff's license while

the parties were briefing the matter and it was under consideration by the Court.  [Doc. 9.]  The

next day, by agreement of the parties, the Court granted Plaintiff's request for a TRO and

temporarily restrained the DFI from taking steps to revoke Plaintiff's license.  [Doc. 15.]  On

May 19, 2005, Defendants filed a motion to dismiss.  [Doc. 17.]  On June 22, 2005, the parties

agreed to continue the hearing on the preliminary injunction motion while the Court ruled on

Defendants' motion to dismiss.  [Doc. 27.]  The parties further agreed that the TRO will remain

in effect until the Court terminates it or issues a preliminary injunction.  *Id.*  On July 11, 2005,

Plaintiff filed a First Amended Complaint.  [Doc. 31.]  On August 1, 2005, Defendants renewed

their motion to dismiss.  [Doc. 32.]

### B.      Facts Alleged by Plaintiff

Plaintiff's Amended Complaint alleges the following facts, which we accept as true for

present purposes.  Plaintiff is an Indiana corporation in the business of making payday loans.

[Doc. 31 at 2.]  A garden-variety payday loan is typically $500 or less with a repayment period

of less than 30 days (which usually encompasses the borrower's next "pay day"). *Id*. at 3. Although the terms of payday loans may vary, Plaintiff describes the most common payday loan transaction as follows. A borrower requests a loan from one of Plaintiff's branches. *Id*. Plaintiff complies with certain underwriting guidelines, including verifying the borrower's income and inquiring about any other "payday debt" the borrower may have. *Id*. The borrower then verifies his or her employment and that he or she will receive a paycheck in the near future to cover the amount of the loan plus the finance fee of approximately $30. *Id*. If the borrower satisfies these requirements, he or she then provides Plaintiff with a post-dated check for the loan amount plus the finance fee. *Id*. In return, Plaintiff provides the borrower with cash equal to the loan amount. *Id*. The borrower has to repay the loan within a certain period of time; otherwise, Plaintiff deposits the borrower's post-dated check. *Id*.

Payday lenders started doing business in Indiana in or around 1994. *Id*. at 5. The DFI took the lead in regulating the payday loan industry by licensing payday lenders under Indiana's consumer loan licensing statutes and by requiring DFI approval on all payday loan forms. *Id*. At that time, the State did not have any laws aimed specifically at payday lenders, but only the Indiana Uniform Consumer Credit Code (IUCCC) which governs consumer lenders in general. *Id*. Among other things, the IUCCC spelled out a maximum allowable interest rate that consumer lenders could charge borrowers but also allowed lenders to contract for and receive a minimum loan finance charge.

In 1994, the Indiana legislature amended the IUCCC provisions regarding minimum loan finance charges. In the wake of this amendment, an issue arose as to whether minimum loan finance charges needed to be included in the maximum allowable interest rate calculation. The

3

DFI took the position that the minimum loan finance charges of payday lenders were exempt from the maximum allowable interest rate calculation.  In 2000, the Indiana Attorney General weighed in with the opposite view, *i.e.* that the minimum fee associated with a payday loan must be included in the maximum allowable interest rate calculation.  *Id*. at 7.  The DFI sent a copy of the Attorney General's opinion to payday lenders but did not implement the opinion as DFI policy.  *Id*.  Rather, the DFI continued to exempt payday lenders' minimum loan finance charges from the maximum allowable interest rate calculation.  *Id*.

Not surprisingly, borrowers that same year brought numerous class actions against payday lenders alleging that their minimum loan finance charges exceeded the interest rate cap set forth in the IUCCC.  *Id*. at 7.  These lawsuits were filed in or removed to the two federal district courts in Indiana.  *Id*.  Trying to divine the intent of the Indiana legislature, the federal district courts certified a question to the Indiana Supreme Court:  whether payday lenders can collect a minimum finance charge that exceeds the interest rate cap set forth in the IUCCC.  *See Livinsgton v. Fast Cash USA, Inc.*, No. IP-99-1226-C (B/S) (S.D. Ind. 2000); *Wallace v. Advance America Advance Cash Centers*, No. 2:00cv0123 AS (N.D. Ind. 2000).

In an *amicus* brief to the Indiana Supreme Court, the DFI reversed course and abandoned its previous view on the issue.  The DFI's brief endorsed the Attorney General's position that minimum loan finance charges should be included in the maximum allowable interest rate calculation.  [Doc. 31 at 7-8.]  Ultimately, the Indiana Supreme Court agreed, holding that minimum loan finance charges were indeed limited by the interest rate cap set forth in the IUCCC.  *Livinsgton v. Fast Cash USA, Inc.*, 753 N.E.2d 572, 577 (Ind. 2001).  "Even if short

term payday loans were never contemplated by the IUCCC, they are nonetheless subject to and controlled by that statute." *Id.*

In March 2002, not long after the *Livingston* decision, the Indiana legislature passed the Small Loan Act (SLA). IND. CODE § 24-4.5-7. The SLA set caps on the amount of payday loans ($400) and the amount of interest payday lenders could collect (15% of the first $100 loaned and 10% of the amount over $100). The maximum total interest charge, however, could not exceed $35. Essentially, the SLA enabled payday lenders to collect a moderate minimum finance charge without running afoul of *Livingston* and the IUCCC's maximum allowable interest rate.

In 2004, the Indiana legislature amended the SLA. The amendments increased the maximum small loan amount from $400 to $500 and increased allowable finance charges to 15% of the first $250, 13% for amounts between $250 and $400, and 10% for amounts between $400 and $500. IND. CODE § 24-4.5-7-201. In addition to increasing allowable finance charges, the amendments allowed payday lenders to contract for a fee, not to exceed $20, if a check presented by the borrower or authorization to debit the borrower's account is dishonored. IND. CODE § 24-4.5-7-202. However, payday lenders may assess this fee only once no matter how many times a check or authorization is dishonored. [Doc. 31 at 9.]

In addition, the amended SLA prohibits lenders from "threatening to use or using the criminal process in any state to collect on a small loan" and "contracting for and collecting attorney's fees on small loans." IND. CODE § 24-4.5-7-410(a), (d). According to Plaintiff, payday lenders are the only financial institutions in the State prohibited from contracting for attorneys' fees. [Doc. 31 at 9.] However, the SLA allows a lender to recover treble damages

and attorneys' fees if "a check or an authorization to debit a borrower's account is used to defraud another person."  IND. CODE § 24-4.5-7-409(2)(d), (f).

After the SLA was enacted, the DFI met with payday lenders to explain how the new law would be enforced.  [Doc. 31 at 10.]  In 2002, when payday lenders asked under what circumstances a payday lender may sue a borrower for fraud, the DFI Director responded:  "that is an issue for the courts to interpret." *Id*.

In the ensuing years, payday lenders went to small claims courts throughout the State to seek redress when a borrower wrote a check on a closed account, placed a stop payment on a check written as security for a payday loan, or provided false information in order to secure a payday loan. *Id*.  Plaintiff and other payday lenders routinely filed suit against the borrowers under Indiana's bad check statutes, which allow for the awarding of treble damages and attorneys' fees. *Id*.  In reviewing approximately 2000 of these cases, Plaintiffs allege that every single Indiana small claims court found that payday lenders were entitled to sue under the Indiana bad check laws and awarded attorneys' fees and treble damages to payday lenders. According to Plaintiff, not one Indiana judge has ruled that payday lenders are not entitled to the relief sought.

Knowing full well that Indiana small claims courts had been awarding treble damages and attorneys' fees to payday lenders, the DFI released a policy statement to all payday lender licensees on February 22, 2005.  The DFI stated that it participated in an advisory role in both the drafting and amending of the SLA and that the DFI had a clear understanding of the legislature's intent.  The DFI advised payday lenders that they may not sue borrowers for treble damages and attorneys' fees unless first they could demonstrate to the DFI that the borrower

engaged in actual fraud, meaning that the borrower had the intent to defraud.  *Id*. at 11.  The DFI

warned payday lenders that failure to comply with this policy could cause the DFI to revoke their

license.  *Id.*  According to Plaintiff, the DFI directed some payday lenders to ignore court orders

and to refund any monies that had been awarded by the Indiana courts in violation of the DFI's

stated policy.  *Id*.  The DFI also took the unusual step of sending letters to Indiana judges,

advising them that the DFI will revoke the license of any payday lender who sues for treble

damages and attorneys' fees inconsistent with DFI policy.  *Id*.

C.     **Plaintiff's Claims**

Plaintiff's amended complaint spans eighteen counts.  Counts One through Eight assert

federal claims under 42 U.S.C. § 1983.  In particular, Counts One through Three allege that the

SLA violates the Equal Protection Clause of the Fourteenth Amendment by prohibiting payday

lenders from using or threatening to use the criminal process to collect on a loan (Count One),

from contracting for or collecting attorneys' fees (Count Two), and by imposing a maximum

non-sufficient fund or "NSF" fee that payday lenders can charge (Count Three).  Counts Four

through Six allege that the SLA violates the Contract Clause by limiting the amount of finance

charges a payday lender can collect (Count Four), by prohibiting payday lenders from

contracting for or collecting attorneys' fees (Count Five), and by capping payday loans at $500

(Count Six).  Counts Seven and Eight allege violations of the Due Process Clause by prohibiting

payday lenders from using or threatening to use criminal process to collect on a loan (Count

Seven) and by threatening to revoke the license of any payday lender who seeks treble damages

and attorneys' fees against a borrower (Count Eight).

Counts Nine through Sixteen raise Indiana constitutional claims and roughly parallel
Plaintiff's federal constitutional claims.  Counts Seventeen and Eighteen allege claims of
mismanagement and civil conspiracy under Indiana law.

Plaintiff asserts all of its claims against all of the Defendants.  Plaintiff has sued certain
DFI employees (Charles W. Phillips, J. Philip Goddard, John J. Schroeder, and Mark B. Tarpey)
"individually and in their representative capacity."  [Doc. 31.]  The First Amended Complaint
does not specify the capacity in which Indiana Attorney General Steve Carter has been sued.  *Id*.
In terms of relief, Plaintiff seeks damages, a declaration that the SLA is unconstitutional, and a
preliminary injunction barring Defendants from enforcing the complained-of provisions against
Plaintiff and other payday lenders.  *Id*.

### DISCUSSION

Defendants seek to dismiss Plaintiff's claims under Rule 12(b)(6).  When ruling on a
Rule 12(b)(6) motion, the court must accept all factual allegations in the complaint as true and
draw all reasonable inferences in favor of the plaintiff.  *Flannery v. Recording Indus. Ass'n of
Am.*, 354 F.3d 632, 637 (7th Cir. 2004).  However, the court "will not strain to find inferences
favorable to the plaintiffs which are not apparent on the face of this ... complaint."  *Coates v. Ill.
State Bd. of Educ.*, 559 F.2d 445, 447 (7th Cir. 1977).

Constitutional challenges to legislative acts, such as the one at issue here, are "not subject
to courtroom fact-finding and may be based on rational speculation unsupported by evidence or
empirical data."  *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 315 (1993).  The Seventh
Circuit thus has affirmed dismissals of constitutional claims under Rule 12(b)(6).  *See, e.g., City
of Chicago v. Shalala*, 189 F.3d 598 (7th Cir. 1999) (affirming Rule 12(b)(6) dismissal of claims

alleging that the Welfare Reform Act was unconstitutional); *Hearne v. Board of Educ. of City of Chicago*, 185 F.3d 770, 774-76 (7th Cir. 1999) (affirming Rule 12(b)(6) dismissal of § 1983 claim against Illinois labor relations board and others challenging, on equal protection grounds, the constitutionality of amendments to state statutes governing collective bargaining in the city of Chicago); *DeSalle v. Wright*, 969 F.2d 273, 275-77 (7th Cir. 1992) (affirming Rule 12(b)(6) dismissal of § 1983 claim against Illinois department of professional regulation challenging, on equal protection and due process grounds, the constitutionality of the Illinois Medical Practice Act); *Khan v. Gallitano*, 180 F.3d 829, 832 (7th Cir. 1999) (affirming Rule 12(b)(6) dismissal of § 1983 claim alleging that village officials violated plaintiff's rights under the contract and due process clauses).

Indeed, where a district court held a trial to assess the constitutionality of a local ordinance, the Seventh Circuit admonished the district court for doing so and disregarded its conclusions. *See Nat'l Paint & Coatings v. City of Chicago*, 45 F.3d 1124, 1127 (7th Cir. 1995). As the court noted, when determining if there is a rational basis for legislation, evidentiary hearings are unnecessary. *Id.* This is because the role of the court is limited in constitutional litigation. As the *Nat'l Paint* court stated: "Even in litigation about torts and contracts, a court holds evidentiary hearings only when necessary to resolve material disputes of fact. In constitutional law, to say that such a dispute exists – indeed, to say that one may be *imagined* – is to require a decision for the state. Outside the realm of 'heightened scrutiny' there is therefore never a role for evidentiary proceedings." *Id.* at 1127 (emphasis in original).

### A.        Permissible Claims under § 1983

All of Plaintiff's federal claims are brought under 42 U.S.C. § 1983 and asserted against all Defendants. § 1983 is not broad enough to encompass all of Plaintiff's claims. Thus, as a jurisdictional matter, we first must decide the predicate question of whether a claim under § 1983 is even cognizable against some of the Defendants.

Generally speaking, §1983 establishes liability for a "person" who deprives another of a constitutional right. 42 U.S.C. §1983. It is well-settled that a state is not a "person" for purposes of §1983. *See Williams v. Wisconsin*, 336 F.3d 576, 580 (7th Cir. 2003); *Illinois Ass'n of Mortg. Brokers v. Office of Banks*, 308 F.3d 762, 765 (7th Cir. 2002). Nor are state officials when they are sued in their official capacity. *See Williams*, 336 F.3d at 580; *Sanville v. McCaughtry*, 266 F.3d 724, 732-33 ("Official capacity suits are actions against the government entity of which the official is a part . . . . To sue the defendants in their official capacities means that [plaintiff] is really suing the state entit[y].").[1]

The DFI is a state agency. *See* Ind. Code § 4-13-1-1 (a department of the state government is a "state agency"); *see also Miller v. Ind. Dep't of Fin. Institutions*, 1991 U.S. Dist. LEXIS 20681 at *7 (S.D. Ind. Nov. 15, 1991) (finding that DFI is a state agency), *rev'd on other grounds by McCammon v. Indiana Dep't of Fin. Institutions*, 973 F.2d 1348 (7th Cir. 1992). Thus, all of Plaintiff's § 1983 claims against the DFI must be dismissed because they do not fall within the statute. In addition, all claims for damages against the individual defendants in their "official" or "representative" capacities must be dismissed for the same reason. Although states

---

[1] Plaintiff sued the DFI employees "in their representative capacity," which we deem equivalent to suing the employees in their official capacity.

and their agencies are generally immune from suit under the Eleventh Amendment, we need not address the constitutional issue because these claims against the state do not fall within § 1983. *See Williams*, 336 F.3d at 581 (7th Cir. 2003) ("[A]ny constitutional [*i.e.* Eleventh Amendment] problem that may exist is subordinate to the statutory deficiency.  Suits against states for damages should be resolved on the ground that they do not come within §1983, not because states are protected by the Eleventh Amendment."); *accord Omosegbon v. Wells*, 335 F.3d 668, 672-73 (7th Cir. 2003).

   To the extent Plaintiff seeks *prospective* relief against state officers for ongoing or anticipated violations of its constitutional rights, Plaintiff is not barred at the outset from proceeding.  § 1983 permits official-capacity suits that seek prospective relief against state officials.  *Williams*, 336 F.3d at 581; *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 n. 10 (1989).  As mentioned earlier, the Eleventh Amendment generally bars suits against states in federal courts.  However, the Supreme Court in *Ex Parte Young* created an exception so that a "private party can sue a state officer in his or her official capacity to enjoin prospective action that would violate federal law."  *Ameritech Corp. v. McCann*, 297 F. 3d 582, 585-86 (7th Cir. 2002), quoting *Ex parte Young*, 209 U.S. 123 (1908).  In deciding whether the *Young* exception applies, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective. *Verizon Maryland, Inc. v. Public Service Comm. of Maryland*, 535 U.S. 635, 645 (2002).  For § 1983 purposes, declaratory relief falls within the definition of prospective relief.  *See Ameritech*, 297 F.3d at 588.

11

Applying the above principles to Plaintiff's causes of action, any claims for damages against the employees in their representative capacity must drop out.  In other words, the only federal claims allowed under §1983 and not barred by the Eleventh Amendment are:  1) any claims for prospective injunctive relief against the individuals in their official or "representative" capacity; and 2) any claims for damages against the individuals in their individual capacity.

### B.    Equal Protection

Having determined which claims are properly before us, we now turn to the substance of those claims.  Plaintiff first alleges that the SLA violates the Equal Protection Clause by prohibiting payday lenders from using or threatening to use the criminal process to collect on a loan (Count One), by prohibiting payday lenders from contracting for or collecting attorneys' fees (Count Two), and by capping the NSF fee that a payday lender can charge (Count Three).

The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. CONST. amend. XIV, § 1.  In simple terms, this is a directive that all persons similarly situated should be treated alike.  *See City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440 (1985).  When asked to assess the constitutionality of a state statute, the Court must first decide which level of scrutiny to apply.  *Shalala*, 189 F.3d at 603.  There are three choices:  1) heightened or strict scrutiny; 2) intermediate scrutiny; and 3) rational basis scrutiny.  *See Ben-Shalom v. Marsh*, 881 F.2d 454, 463 (7th Cir. 1989).  In the equal protection context, the level of scrutiny depends on whether the statute targets a "suspect class" (such as one based on race or sex).  *See Lamers Dairy Inc. v. U.S. Dept. of Agr.*, 379 F.3d 466, 472 (7th Cir. 2004).  If the statute does not target

a suspect class, then courts apply rational basis scrutiny.  Plaintiff does not allege that the SLA targets a suspect class.  Therefore, we apply rational basis scrutiny.  *Id.*

For better or worse, the political branches of government make policy judgments. Whether those judgments are good ones depends upon whose ox is being gored.  People who agree to pledge next week's paycheck for a loan today are probably delighted with the SLA. Payday lenders are not so sanguine.  For our purposes, who is "right" in that policy debate is unimportant.  Because Plaintiff is not a member of a protected class, as long as the SLA is rationally related to a legitimate government interest, it must be upheld.

Economic regulations such as the SLA are accorded "a strong presumption of validity." *Id.*, citing *Heller v. Doe*, 509 U.S. 312, 319 (1993).  The presumption applies to both legislative and administrative actions.  *Id.*, citing *Pac. States Box & Basket Co. v. White*, 296 U.S. 176, 185-86 (1935).  Legislation that does not burden a suspect class or affect fundamental rights satisfies the equal-protection requirement if the legislature could think that the law is "rationally related to any legitimate goal of government."  *Johnson v. Daley*, 339 F.3d 582, 585 (7th Cir. 2003).

The Supreme Court has stated:  "[E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.  In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is ***any*** reasonably conceivable state of facts that could provide a rational basis for the classification."  *Beach Communications, Inc.*, 508 U.S. at 313 (emphasis added).  Put another way, a person challenging

13

the law must "negative every conceivable basis which might support" the rule.  *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973).

The SLA plainly survives rational basis scrutiny because Defendants have offered a "conceivable basis" for the law.  Defendants note that "[t]he SLA has a rational basis to protect consumers who need emergency cash from payday lenders that could pray [sic] upon their circumstances . . ."  [Doc. 33 at 12].  This Court need not decide whether Defendants' reason for the SLA is compelling or whether there is objective evidence to support the reason.  *See PayDay Loan Store of Wisconsin v. City of Madison*, 333 F. Supp. 2d 800, 804 (W.D. Wis. 2004).  As long as the speculation is rational, which it is here, it need not be supported by evidence or empirical data.  *Beach Communications, Inc.*, 508 U.S. at 315.  In sum, because Defendants have hypothesized at least some sound reason for the complained-of provisions of the SLA, they do not violate the Equal Protection Clause.  Plaintiff's equal protection claims therefore must be dismissed.

C.    **Due Process**

Plaintiff asserts that Defendants have violated the Due Process Clause by prohibiting payday lenders from using or threatening to use the criminal process to collect on a loan (Count Seven) and by threatening to revoke the license of any payday lender who seeks treble damages and attorneys' fees against a customer (Count Eight).  Plaintiff claims that these actions violated both its procedural due process and substantive due process rights.

The Due Process Clause of the Fourteenth Amendment says a state shall not "deprive any person of life, liberty, or property, without due process of law."  U.S. CONST. amend. XIV.   The case law acknowledges two types of due process:  substantive and procedural.  *See Doe v. City of*

*Lafayette, Ind*., 377 F.3d 757, 767-68 (7th Cir. 2004). Substantive due process protects

individuals from being subjected to "the arbitrary exercise of the powers of government,

unrestrained by the established principles of private rights and distributive justice." *Id*. (citation

and quotation omitted). Procedural due process allows the government to deprive a citizen of

"life, liberty, or property" only in accordance with certain procedural protections. *Id.*

Substantive due process is not an easy concept to get one's arms around. *Tun v.

Whitticker*, 398 F.3d 899, 902 (7th Cir. 2005). At bottom, substantive due process is concerned

with the nature of the actual right deprived. In other words, there are some rights that are so

fundamental that no amount of fair process could justify the deprivation of that right. *Daniels v.

Williams*, 474 U.S. 327, 331 (1986). For example, as noted in *Washington v. Glucksberg,* 521

U.S. 702 (1997), the Supreme Court has determined that no amount of fair process would justify

taking away the right to marry, *Loving v. Virginia,* 388 U.S. 1 (1967); to have children, *Skinner

v. Oklahoma ex rel. Williamson,* 316 U.S. 535, (1942); to direct the education and upbringing of

one's children, *Meyer v. Nebraska,* 262 U.S. 390 (1923); to marital privacy, *Griswold v.

Connecticut,* 381 U.S. 479 (1965); to use contraception, *id.*; *Eisenstadt v. Baird,* 405 U.S. 438

(1972); to bodily integrity, *Rochin v. California,* 342 U.S. 165 (1952); and to abortion, *Planned

Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992). This prohibition

against certain governmental actions serves to prevent government from using its power for

oppressive purposes. *Daniels*, 474 U.S. at 331.

Where the concept of substantive due process ends is not well-defined. However, "[b]oth

the Supreme Court and the Seventh Circuit have emphasized how limited the scope of the

substantive due process doctrine is." *Lee v. City of Chicago,* 330 F.3d 456, 467 (7th Cir. 2003)

(citing *Dunn*, 158 F.3d at 965).  The Supreme Court is "'reluctant to expand the concept of substantive due process because guideposts for responsible decision making in this unchartered area are scarce and open-ended.'" *Glucksberg,* 521 U.S. at 720 (quoting *Collins v. Harker Heights,* 503 U.S. 115, 125 (1992)).  Thus, within this limited framework, we analyze Plaintiff's substantive due process claims.

Plaintiff's substantive due process claims fail for several reasons.  First, the Seventh Circuit "has held repeatedly that economic regulation must be evaluated under equal protection principles, and that laws supported by a rational basis are within the power of the elected branches of government."  *National Paint*, 45 F.3d at 1129 (refusing to consider claim that ordinance violates substantive due process rights); *see also Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 470 n.12 (1981) ("From our conclusion under equal protection, . . . it follows *a fortiori* that the Act does not violate the Fourteenth Amendment's Due Process Clause.").  For this reason alone, Plaintiff's substantive due process claims should be dismissed.

Second, Plaintiff has not identified how the complained-of state actions involve a fundamental right to warrant heightened scrutiny.  A fundamental right is one "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty," such that "neither liberty nor justice would exist if they were sacrificed."  *Glucksberg*, 521 U.S. at 720-21 (citations omitted).   Plaintiff argues in passing that the SLA "affect[s] the fundamental rights which the United States Constitution affords to everyone" by prohibiting payday lenders from contracting for attorneys' fees.  [Doc. 34 at 6.]  Not surprisingly, we could find no case which recognizes the ability to contract for attorneys' fees as a fundamental right under the United States Constitution.  Thus, even if we were to analyze the SLA under substantive due process

principles, we would have to apply rational basis scrutiny and the challenged provisions easily pass muster.  Plaintiff's substantive due process claim must therefore be dismissed.

Plaintiff's procedural due process claims fare no better.  Procedural due process claims require a two-step inquiry:  1) has the plaintiff been deprived of a protected interest; and 2) if so, what process is due the plaintiff.  *Doherty v. City of Chicago*, 75 F.3d 318, 322 (7th Cir. 1996).  As for the first step, the procedural protections of the Due Process Clause are triggered only when state action implicates a constitutionally protected interest in life, liberty, or property.  *Lekas v. Briley*, 405 F.3d 602, 607 (7th Cir. 2005), citing *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 570- 71 (1972).  A plaintiff cannot complain of procedural due process violations under § 1983 unless the state has deprived him or her of such a constitutionally protected interest.  *Lekas*, 405 F.3d at 607, citing *Kentucky Dept. of Corr. v. Thompson*, 490 U.S. 454, 460 (1989).

Here, Plaintiff does not allege that it has been deprived of a constitutionally protected interest without procedural due process.  Plaintiff complains the SLA has deprived it of the right to use the criminal justice system to redress criminal activity undertaken by its customers.  The SLA is an act of legislation and, absent rare circumstances not present here, cannot serve as the basis of a procedural due process claim.  *See Pro-Eco, Inc. v. Board of Com'rs of Jay County, Ind.*, 57 F.3d 505, 513 (7th Cir. 1995) ("Governing bodies may enact generally applicable laws, that is, they may legislate, without affording affected parties so much as notice and an opportunity to be heard.") (citation omitted).  Moreover, to state a procedural due process claim, Plaintiff must allege the deprivation of an interest.  In Count Eight, Plaintiff alleges merely that the DFI has *threatened* to revoke Plaintiff's license if it engages in certain conduct.  A threat is

17

not a deprivation.  Thus, Plaintiff has failed to state a procedural due process claim under § 1983.

Even if the DFI sought to revoke Plaintiff's license, Indiana law provides Plaintiff with an abundance of process to challenge the revocation.  Before the DFI revokes a license, Indiana law requires the agency to provide notice to the licensee, order the licensee to show cause why its license should not be revoked, and set a hearing before an administrative law judge (ALJ) whereby the licensee can retain counsel and present evidence as to why its license should not be revoked.  *See*, *e.g.,* IND. CODE § 24-4.5-3-504.  In addition, before revocation, the DFI must give the licensee "an opportunity to show compliance with all lawful requirements for retention of the license."  IND. CODE § 24-4.5-3-504(b)(2).  Finally, the licensee can appeal any adverse decision by the ALJ, seek judicial review of the agency's final action in state court, and, if necessary, appeal the trial court's decision to the Indiana appellate courts.  IND. CODE § 4-21.5-5-2 *et seq*. It is difficult to imagine how these provisions would not protect Plaintiff's procedural due process rights in any license revocation proceeding.  Counts Seven and Eight of Plaintiff's amended complaint are therefore dismissed

### D.    Contract Clause

Plaintiff also asserts that the SLA violates the Contract Clause of the United States Constitution by limiting the amount of finance charges that payday lenders can collect (Count Four), by prohibiting payday lenders from contracting for or collecting attorneys' fees (Count Five), and by capping the amount of payday loans at $500 (Count Six).

The Contract Clause of the United States Constitution provides that "[n]o State shall ... pass any ... law impairing the Obligation of Contracts."  U.S. CONST., art I, §10.  The Contract Clause limits the power of the States to modify their own contracts as well as to regulate those

between private parties.  *U.S. Trust Co. of New York v. New Jersey*, 431 U.S. 1, 17 (1977).  A

State violates the Contracts Clause if a change in state law substantially impairs a contractual

relationship.  *See Khan*, 180 F.3d at 832 (quotation and citations omitted).  The inquiry has three

components:  (1) whether there is a contractual relationship; (2) whether a change in law impairs

that contractual relationship; and (3) whether the impairment is substantial.  *Id*.

Plaintiff's Amended Complaint fails the first prong of the analysis.  Plaintiff does not

allege that the SLA substantially impaired or interfered with an existing contractual relationship.

In addition, Plaintiff fails to allege (nor is there anything in the statute to indicate) that the SLA

amendments in 2004 applied retroactively to pre-existing contracts.  Instead, Plaintiff complains

that the SLA unconstitutionally limits payday lenders' ability to contract with customers in the

future.  [Doc. 31 at 21, 23.]

This is not enough to state a claim under the Contracts Clause.  *See, e.g., Texaco, Inc. v.

Short*, 454 U.S. 516, 531 (1982) (A "statute cannot be said to impair a contract that did not exist

at the time of its enactment."); *Chrysler Corp. v. Kolosso Auto Sales, Inc*., 148 F.3d 892, 896

(7th Cir. 1998) (retroactive legislation is contrary to the original purpose of the Contracts

Clause); *United States v. Kimberlin*, 776 F.2d 1344, 1347 (7th Cir. 1985) (the Contracts Clause

is one of several constitutional clauses "designed to deal with retroactive applications of new

rules that could penalize detrimental reliance on old rules")(dicta); *Maryland State Teachers

Ass'n, Inc. v. Hughes*, 594 F. Supp. 1353, 1360 (D. Md. 1984) ("A very important prerequisite to

the applicability of the Contract Clause . . .  to an asserted impairment of a contract by state

legislative action is that the challenged law operate with retrospective, not prospective effect.");

*accord Howell v. Anne Arundel Cty.*, 14 F. Supp. 2d 752, 755 (D. Md. 1998) (plaintiffs' Contract

Clause claims fail because the complained-of pension law change applied only prospectively and not retroactively to vested benefits).  Accordingly, Counts Four, Five, and Six  are dismissed.

> **E.      State Law Claims**

Having dismissed all of Plaintiff's federal claims, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims.  *See* 28 U.S.C. § 1367(c)(3) (a district court may decline to exercise supplemental jurisdiction over related state law claims if "the district court has dismissed all claims over which it has original jurisdiction").  It is clear that state court is a much better place for Plaintiff to pursue his state law claims against Defendants.

At the heart of Plaintiff's claims is whether an Indiana agency responsible for enforcing an Indiana statute has overstepped its bounds under Indiana law.  Plaintiff essentially contends that the DFI has no business telling Indiana state court judges how to do their job.  According to Plaintiff, if Indiana courts are allowing payday lenders to sue deadbeat borrowers under the Indiana bad check statutes and to collect the treble damages and attorneys' fees that those statutes provide, then that should end the matter.  By contrast, the DFI believes such orders skirt the intent of the SLA and has threatened to use its regulatory muscle to put an end to it.  Nothing in the United States Constitution prevents the DFI from acting as it has.  Whether Indiana state law allows it may be a different matter.  But the answer to that question is best left to the state judiciary.  *See O' Grady v. Village of Libertyville*, 304 F.3d 719, 725 (7th Cir. 2002) (district court acted "quite reasonably" in declining to exercise supplemental jurisdiction of state law claims under § 1367(c)(3) where "[t]he federal courts have little or nothing to say about whether a Village president properly applied a Village ordinance to a local establishment.").

## CONCLUSION

For the foregoing reasons, Defendants Motion To Dismiss [Doc. 33] is **GRANTED IN PART WITH PREJUDICE AND IN PART WITHOUT PREJUDICE.**  Counts One through Eight are **DISMISSED WITH PREJUDICE**.  The Court declines to exercise supplemental jurisdiction over Counts Nine through Eighteen, all of which arise under Indiana law.  Those counts, therefore, are **DISMISSED WITHOUT PREJUDICE**.  Plaintiff's Motion for a Preliminary Injunction [Doc. 3] and Motion To Certify a Class [Doc. 12] are **DENIED AS MOOT**.

**SO ORDERED.**

ENTERED:  January 17, 2006

s/ Philip Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT